# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
**No. 21-0071V**

|  |  |
|---|---|
| ELSIE MCKAY, | Chief Special Master Corcoran |
| Petitioner, | Filed: December 11, 2023 |
| v. |  |
| SECRETARY OF HEALTH AND HUMAN SERVICES, |  |
| Respondent. |  |

*Bridget Candace McCullough, Muller Brazil, LLP, Dresher, PA, for Petitioner.*

*Meghan Murphy, U.S. Department of Justice, Washington, DC, for Respondent.*

## DECISION AWARDING DAMAGES[1]

On January 5, 2021, Elsie McKay filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleged that that she suffered a right shoulder injury related to vaccine administration ("SIRVA") resulting from a tetanus diphtheria acellular pertussis ("Tdap") vaccine received on April 26, 2018. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU"), and although entitlement was conceded, the parties could not agree to a damages sum.

For the reasons set forth below, I find that Petitioner is entitled to a damages award in the amount of **$127,500.00 for actual pain and suffering, plus $676.71 in actual unreimbursable expenses.**

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website , and/or at  https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755.  Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

## I.     Relevant Procedural History

Respondent conceded that Petitioner is entitled to damages (ECF No. 27), and the parties began damages negotiations. However, they reached an impasse (ECF No. 33). Accordingly, Petitioner filed a damages brief on March 2, 2023 (ECF No. 35). Respondent responded on April 24, 2023 (ECF No. 37). The matter of damages is now ripe for resolution.

## II.     Relevant Medical History

Petitioner received a Tdap vaccine in her right deltoid on April 26, 2018, during an appointment with her primary care provider ("PCP") Dr. Rose Miller. Ex. 1 at 118-123. Eleven days later (May 7, 2018), she called her PCP noting that since the April 26th vaccination, she could now "hardly lift her arm." *Id.* at 141. She was offered, but declined, a same day appointment. *Id.* Less than a month later (May 29, 2018), she again called her PCP, reporting that her right arm was now losing range of motion ("ROM"), and that she was having difficulty sleeping due to pain. *Id.* at 148. Ibuprofen did not help. *Id.* An appointment with Dr. Miller was scheduled for June 21st. *Id.* Petitioner was advised to go to urgent care or call back if she wished to be seen sooner by another provider. *Id.*

Ten days after her second call to her PCP, and 43 days after vaccination (on June 8, 2018), Petitioner went to Samaritan Urgent Care complaining of right shoulder pain for the past six weeks. Exs. 2 at 69; 5 at 1107. She reported that she had received a Tdap vaccine in the upper deltoid and was having moderate aching pain that was worsening, along with limited ROM and stiffness. Ex. 2 at 69. She had tried non-steroidal anti-inflammatory drugs ("NSAIDs"), acetaminophen, movement, and rest, with no relief. *Id.* She was advised to continue taking NSAIDs, use heat and ROM exercises, and follow up with her PCP if she did not improve over the next two weeks. *Id.* at 70.

Two weeks later (June 21, 2018), Petitioner saw Dr. Miller for "severe right shoulder pain" that started shortly after her tetanus booster on April 26th. Ex. 1 at 155-56. She had been taking ibuprofen regularly, with minimal relief, and was having difficulty sleeping due to pain. *Id.* at 156. On examination, her right shoulder was tender over the bursa and along the biceps tendon, with some mild tenderness through the trapezius. *Id.* at 157. She had limited active ROM due to pain, with 120 degrees in abduction and flexion and 60 degrees in extension.[3] *Id.* She was assessed with acute pain and bursitis of the right shoulder, as well as lumbar radiculopathy. *Id.* Petitioner was directed to start

---

[3] Normal shoulder ROM for adults ranges from 165 to 180 degrees in flexion, 170 to 180 degrees in abduction, and 50 to 60 degrees in extension. Cynthia C. Norkin and D. Joyce White, MEASUREMENT OF JOINT MOTION: A GUIDE TO GONIOMETRY 72, 76, 80 (F. A. Davis Co., 5th ed. 2016).

Meloxicam and continue ROM exercises, ice, and heat, and referred to an orthopedist. *Id.*

Two weeks later (July 5, 2018), Petitioner saw orthopedic physician assistant ("PA") Stephen Bennett for her right shoulder pain related to a tetanus injection on April 26, 2018. Ex. 3 at 9. She stated that her arm became painful immediately after the injection, and she complained of severe pain, limited ROM, dysfunction, and inability to sleep. *Id.* On examination, her right shoulder ROM was 90 degrees in abduction (compared to 180 degrees on the left), 120 degrees in forward flexion (compared to 180 degrees on the left), 45 degrees in extension, 70 degrees in external rotation, and 45 degrees in internal rotation. *Id.* at 10. She was assessed with a right shoulder rotator cuff injury, and PA Stephens recommended an MRI. *Id.*

Petitioner had a right shoulder MRI on July 16, 2018. Ex. 1 at 191. The MRI showed evidence of a full-thickness tear of the supraspinatus, fluid within the subacromial/subdeltoid bursa possibly reflecting findings of bursitis, suggested intraarticular rupture of the biceps tendon with proximal retraction, and hypertrophic changes of the acromioclavicular joint with inferior osteophytosis. *Id.*

A week later (July 23, 2018), Petitioner returned to PA Stephens to review the MRI results. Ex. 3 at 5. PA Stephens determined that Petitioner had a right shoulder rotator cuff tear, long head biceps tear, and hypertrophic changes. *Id.* He discussed both operative and non-operative treatment options. *Id.* Petitioner considered, but was apprehensive about, surgery. *Id.* PT and a local injection were also discussed. *Id.*

Two months later (October 1, 2018), Petitioner returned to her PCP to follow up on her right shoulder pain and other concerns. Ex. 1 at 212. Dr. Miller advised that surgery was her best option given the severity of the tear, though Petitioner remained nervous about surgery. *Id.* at 213-14. A week later, Petitioner called her PCP, reporting that the tramadol prescribed for her back pain was not helping, and that she was having shoulder pain as well. *Id.* at 235.

Petitioner was seen by her PCP on December 6, 2018, to follow up on a number of unrelated health concerns. Ex. 1 at 278-80. The record does not mention any shoulder concerns. *Id.*

Two and a half months later (February 26, 2019), Petitioner called her PCP requesting a referral to Dr. Richard Stanley for her right shoulder pain. Ex. 1 at 383. Petitioner saw Dr. Miller the next day, reporting that her right shoulder continued to disturb her sleep and affect her ability to function, but she was afraid of surgery because it would prevent her from using her upper extremity even more for several weeks. *Id.* at 398.

On March 18, 2019, Petitioner saw orthopedist Dr. Richard Stanley for progressive right shoulder pain. Ex. 8 at 25. On examination, both shoulders had similar active and passive ROM. *Id.* at 27. Hawkins impingement testing was "markedly positive" on the right

side, with tenderness to palpation over the right shoulder joint. *Id.* Dr. Stanley assessed Petitioner with a full thickness rotator cuff tear. *Id.* at 27-28. Petitioner remained apprehensive about surgery and opted for conservative treatment including a steroid injection, which was administered that day. *Id.*

Petitioner followed up with Dr. Stanley two months later (May 13, 2019). Ex. 8 at 22. She reported "marked improvement" in her right shoulder pain following the steroid injection, but that she had experienced a "mild recurrence" of her symptoms starting about a week earlier. *Id.* at 24. Her physical examination findings were unchanged. *Id.* Based on her favorable response to the steroid injection, Petitioner elected to continue conservative treatment and begin a rotator cuff strengthening program. *Id.*

Petitioner returned to Dr. Stanley on July 8, 2019, reporting persistent shoulder symptoms and mild activity-related right shoulder pain with occasional crepitus with motion. Ex. 8 at 19-21. Her physical examination remained unchanged. *Id.* at 21. Petitioner elected to continue conservative treatment. *Id.* Dr. Stanley recommended a repeat MRI. *Id.*

Petitioner's second MRI (July 25, 2019) again showed a full-thickness tear of the supraspinatus that "appear[ed] to be stable to slightly increase[d] in size when compared to prior exam," stable intra-articular rupture of the biceps tendon, and degenerative changes. Ex. 5 at 1419.

Petitioner followed up with Dr. Miller on September 9, 2019. Ex. 5 at 1434. Her right shoulder continued to be painful and disturb her sleep, and she had increased weakness in her right upper extremity as well. *Id.* On examination, she had posterior tenderness of the shoulder as well as a soft tissue mass at the right elbow. *Id.* at 1439. Dr. Miller had some concern that she had experienced "further disruption of her rotator cuff." *Id.* Three days later (September 12, 2019), Petitioner saw orthopedic PA John Navarro, reporting increased swelling/fullness in her right elbow and increasing pain along the anterior shoulder consistent with biceps pathology. Ex. 8 at 15-18. She was more open to surgery than she had been in the past, but remained apprehensive and chose to continue conservative treatment. *Id.* at 18.

Petitioner returned to Dr. Stanley on October 28, 2019, at which time she elected to pursue surgery for her progressive right shoulder symptoms to prevent additional tearing and functional loss. Ex. 8 at 15. She had a pre-operative evaluation on December 17, 2019. *Id.* at 9.

On January 16, 2020, Petitioner underwent right shoulder arthroscopic rotator cuff repair of the supraspinatus and infraspinatus, arthroscopic Mumford procedure, and subacromial decompression with partial acromioplasty. Exs. 4 at 22-25; 5 at 1540-42. She saw Dr. Stanley for a post-operative follow up on February 3, 2020, reporting continued improvement in her pain and swelling since surgery. Ex. 4 at 15-18. The arthroscopy portals were clean, dry, and intact, with no erythema or drainage and minimal

edema. *Id.* at 18. She was directed to continue daily exercises and follow up in four weeks. *Id.* On March 2, 2020, PA Navarro found her right shoulder passive ROM to be 110 degrees of forward elevation, 90 degrees of abduction, and 40 degrees of external rotation. *Id.* at 14. Petitioner was advised to do home exercises three times daily. *Id.*

The following month (April 13, 2020), Petitioner followed up with Dr. Stanley, noting recent improvement in overhead ROM and minimal residual shoulder pain. Ex. 4 at 9-10. On examination, her right shoulder passive ROM was 150 degrees in forward elevation, 110 degrees in abduction, and 30 degrees in external rotation. *Id.* at 10. Dr. Stanley recommended strengthening exercises using Thera-Bands every other day and ROM exercises three times daily. *Id.*

On May 14, 2020, Petitioner underwent a Medicare Annual Wellness visit. Ex. 5 at 1730. She reported that she continued to do ROM exercises at home following her right shoulder rotator cuff repair surgery. *Id.* at 1731.

On June 22, 2020, Petitioner returned to Dr. Stanley. Ex. 4 at 3-7. She had continued home exercises and resumed the majority of her activities of daily living, with minimal residual shoulder symptoms. *Id.* at 6. On examination, her right shoulder passive ROM was "nearly symmetric" to the left shoulder. *Id.* Petitioner was advised to continue every other day strengthening, and progress weight bearing to facilitate activities of daily living, but cautioned not to perform heavy lifting overhead or above chest level until six to nine months after surgery. *Id.* She was to return in three months for a "likely final" recheck. *Id.* Three days later, Dr. Stanley issued a physical therapy ("PT") referral for "ROM, strengthen," and a home exercise program. Ex. 11 at 13.

The following month (July 16, 2020), Petitioner attended the PT evaluation for right shoulder stiffness. Ex. 11 at 8. She was unable to reach above shoulder height, and reported pain that was "very mild" currently but ranged to five out of ten at worst. *Id.* at 8, 39. Her right shoulder ROM was 100 degrees in flexion (compared to 165 degrees on the left), 90 degrees in abduction (compared to 160 degrees on the left), and 60 degrees in extension. *Id.* at 9. She also exhibited reduced right shoulder strength. *Id.* at 9-10. Petitioner did not schedule follow up visits and was therefore discharged from PT on August 31, 2020. *Id.* at 7.

On September 21, 2020, Petitioner underwent a second PT evaluation for persistent right shoulder pain and stiffness. Ex. 11 at 47. She was not currently in any pain, but reported pain reaching a level of four out of ten at worst. *Id.* Her right shoulder active ROM was 95 degrees in flexion, 60 degrees in extension, 100 degrees in abduction, 60 degrees in internal rotation, and 40 degrees in internal rotation. *Id.* at 48-49. She was assessed as having "significant restrictions" in right shoulder flexibility, with likely secondary impingement. *Id.* at 50.

Petitioner attended five more PT sessions through December 10, 2020, for an overall total of seven PT sessions. Ex. 11 at 75-99. At her September 28th session, she

requested that her treatment frequency be reduced to every other week. *Id.* at 75. On October 12th, she reported that she could only reach to about shoulder height. *Id.* at 79. Later that month (October 29, 2020), the physical therapist noted that her right shoulder flexion was limited to 90 degrees and that it "appears to be a muscle deficiency as AAROM [active assisted ROM] flexion [she could] easily achieve 150 degrees." *Id.* at 87.

At Petitioner's final PT session on  December 10, 2020, she reported that her shoulder was getting better. Ex. 11 at 99. She stated that she had been "working on it," but the therapist noted that "[w]ith further questioning, it is clear that she is not really following her HEP [home exercise program] or handouts, though does appear to be engaging in some of the exercises." *Id.* Her right shoulder flexion continued to be limited but improving slowly. *Id.* She had shown "moderate improvement" since intake. *Id.* The therapist stated, "[d]ischarge is not yet clinically indicated, but this patient declined to schedule any further treatment. During the course of treatment she also declined the recommended frequency of treatment." *Id.* For these reasons and the fact that she did not start PT promptly after surgery, her long term goals were not met. *Id.* Petitioner was "strongly encouraged" to continue her exercises at home. *Id.* The record does not indicate that Petitioner sought additional care for her right shoulder after this time.

### III.    Affidavit Evidence and Personal Statement

Petitioner filed an affidavit (Ex. 7) and an undated, unsigned, and unsworn personal statement (Ex. 13) in support of her claim. The affidavit addresses statutory requirements and indicates that she suffered residual effects of her injuries for more than six months, but does not provide further details about her injury. Ex. 7.

In her personal statement, Petitioner states that she told the nurses she did not want a Tdap vaccine, but they said it had been ten years and insisted that she receive it. Ex. 13 at 1. Petitioner recalled that when the vaccine was injected, she felt "excruciating pain." *Id.* She knew something was different than other shots she had received in the past. *Id.* By the time she got to her car, she could not even lift her arm to shift the gears of the car. *Id.* She recalls intense pain that interfered with her sleep "night after night." *Id.* When it didn't improve, she called her PCP and was told to move her arm to help with the pain. *Id.*

When she went to urgent care, she expected to get a cortisone injection for the pain, but was told to see her doctor. Ex. 13 at 1. When she saw Dr. Miller a couple of weeks later, Dr. Miller said she did not give cortisone shots. *Id.* She was referred to PA Bennett, who declined to give her an injection for the pain, recommending surgery instead. *Id.* She viewed surgery as a last resort and waited for months thinking it would improve, but it did not. *Id.* Ultimately, Dr. Stanley gave her a cortisone shot, which helped for several months but then wore off. *Id.* When a second MRI showed more tearing, Dr. Stanley said she should have surgery, and she agreed. *Id.*

Petitioner states that her shoulder surgery was "[v]ery very painful. So painful if I had known how painful I probably wouldn't have gotten it." Ex. 13 at 1. Her recovery was "long and painful. Very agonizing." *Id.* She has not been able to sleep without pain for a couple of years, and constant pain and lack of sleep have made her depressed and very stressed. *Id.* Family members have had to stay with and help her through her recovery. *Id.*

Her arm still makes clicking noises, and she now has a "popeye deformity" that looks "awful," with her bicep having dropped down in her elbow. Ex. 13 at 2. She is a retired hairstylist, and would like to work part time but cannot do so. *Id.* She does her PT exercises every day and hopes for improvement. *Id.* Her pain level stays at about two or three unless she uses her arm a lot, at which point in increases to six to eight. *Id.* She cannot lift her arm overhead like she used to, and her shoulder feels stiff. *Id.*

## IV.    The Parties' Arguments

Petitioner proposes a pain and suffering award of $130,000.00. Petitioner's Brief in Support of Damages, filed March 2, 2023, at *1 (ECF No. 35) ("Br."). Petitioner relies on *Blanco*, *Wilson*, and *Rafferty*, in which the petitioners were awarded $135,000.00, $130,000.00, and $127,500.00, respectively.[4] Petitioner argues that she suffered a moderately severe SIRVA that ultimately required surgical intervention. Br. at *9. Her pain was relatively severe immediately, resulting in a call to her PCP less than two weeks after vaccination. *Id.* She called her PCP again later that month, then went to urgent care. *Id.* She continued to follow up with her PCP and orthopedist hoping that her shoulder would improve with conservative care, but unfortunately, it did not. *Id.* at *9-10. She tried a cortisone injection, which helped for several months. *Id.*

Petitioner later underwent surgery. Br. at *11. Initially, she had improved pain and ROM after surgery, but her pain and reduced ROM returned. *Id.* Petitioner argues that her injury, treatment, and the impact on her quality of life are comparable to *Blanco*, *Wilson*, and *Rafferty*, all of which involve moderately severe injuries that required surgery. Br. at *11.

Respondent counters that Petitioner experienced a mild to moderate SIRVA, albeit one that required surgical intervention, and proposes an award of $87,500.00. Respondent's Brief on Damages, filed April 24, 2023, at *6,10 (ECF No. 6) ("Resp."). Respondent emphasizes gaps in Petitioner's treatment and delay in pursuing surgery. Resp. at *6, 9. Once Petitioner had surgery in January 2020, she had an excellent

---

[4] *Blanco v. Sec'y of Health & Human Servs*., No. 18-1361V, 2020 WL 4523473 (Fed. Cl. Spec. Mstr. July 6, 2020); *Wilson v. Sec'y of Health & Human Servs*., No. 19-0035V, 2021 WL 1530731 (Fed. Cl. Spec. Mstr. Mar. 18, 2021); and *Rafferty v. Sec'y of Health & Human Servs*., No. 17-1906V, 2020 WL 3495956 (Fed. Cl. Spec. Mstr. May 21, 2020).

recovery by June 2020. *Id.* at *6. After reporting minimal pain at a PT evaluation, she did not follow up and was discharged, which Respondent interprets as "indicating that any residual pain was likely very mild in nature." *Id.* at *6-7. Petitioner later attended six additional PT sessions, but then declined to schedule further treatment. *Id.* at *7.

In support of his proposed award, Respondent cites *Hunt* and *Shelton*, in which petitioners were awarded $95,000.00 and $97,500.00 in pain and suffering, respectively.[5] Resp. at *7-8. Respondent argues that the facts of *Hunt* reflect more extensive care spanning a 15 month period. *Id.* at *7. The *Hunt* petitioner pursued more extensive PT and more cortisone injections, with continued pain after surgery. *Id.* Thus, Respondent argues that Petitioner's award should be less than that awarded in *Hunt*. *Id.* Respondent acknowledges that the *Shelton* petitioner delayed seeking treatment until five months after vaccination, but asserts that thereafter she sought more consistent care including three steroid injections, significant PT before and after surgery, and fluctuating levels of pain. *Id.* at *7-8.

Further, Respondent contends that the cases Petitioner cites are distinguishable, all involving "far more extensive treatment." Resp. at *8. For example, the *Blanco* petitioner had immediate severe pain, and underwent significant treatment for over two years. *Id.* And the petitioners in *Wilson* and *Rafferty* both attended more PT sessions. *Id.* at *9. In contrast, Ms. McKay did not pursue aggressive treatment as soon after vaccination, or attend as many PT sessions. *Id.* While Ms. McKay's treatment course spanned a longer time, there were gaps with no treatment, or "periods where her pain was clearly mild," suggesting a lower award is warranted. *Id.* Thus, Respondent argues that Petitioner "should not be awarded more than other petitioners whose courses were shorter because they sought care more regularly and received more extensive treatment." *Id.* Respondent concludes that Petitioner received less treatment than any of the cited cases, warranting a lower award than any of them. *Id.* at *9-10.

## V.   Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4).

Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other

---

[5] *Hunt v. Sec'y of Health & Human Servs.*, No. 19-1003V, 2022 WL 2826662 (Fed. Cl. Spec. Mstr. June 16, 2022), and *Shelton v. Sec'y of Health & Human Servs.*, No. 19-0279V, 2021 WL 2550093 (Fed. Cl. Spec. Mstr. May 21, 2021).

remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Human Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with my predecessor Chief Special Masters) adjudicating similar claims.[6] *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by a decision of the Court of Federal Claims several years ago. *Graves v. Sec'y of Health & Human Servs.,* 109 Fed. Cl. 579 (Fed. Cl. 2013). *Graves* instead emphasized the importance of assessing pain and suffering by looking to the record evidence specific to the injured individual, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id.* at 595. Under this approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap.

---

[6] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of SIRVA claims, were assigned to former Chief Special Master Dorsey, now Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

Although *Graves* is not controlling of the outcome in this case, it provides reasoned guidance in calculating pain and suffering awards.

> **VI.    Prior SIRVA Compensation Within SPU[7]**
>
> **A.    Data Regarding Compensation in SPU SIRVA Cases**

SIRVA cases have an extensive history of informal resolution within the SPU. As of July 1, 2023, 3,304 SPU SIRVA cases have resolved since the inception of SPU on July 1, 2014. Compensation was awarded in 3,211 of these cases, with the remaining 93 cases dismissed.

1,834 of the compensated SPU SIRVA cases were the result of a reasoned ruling that petitioner was entitled to compensation (as opposed to a settlement or concession).[8] In only 173 of these cases, however, was the amount of damages *also* determined by a special master in a reasoned decision.[9] As I have previously stated, the written decisions setting forth such determinations, prepared by neutral judicial officers (the special masters themselves), provide the most reliable precedent setting forth what similarly-situated claimants should also receive.[10]

The data for all groups described above reflect the expected differences in outcome, summarized as follows:

---

[7] All figures included in this decision are derived from a review of the decisions awarding compensation within the SPU. All decisions reviewed are, or will be, available publicly. All figures and calculations cited are approximate.

[8] The remaining 1,377 compensated SIRVA cases were resolved via stipulated agreement of the parties without a prior ruling on entitlement. These agreements are often described as "litigative risk" settlements, and thus represent a reduced percentage of the compensation which otherwise would be awarded. Because multiple competing factors may cause the parties to settle a case (with some having little to do with the merits of an underlying claim), these awards from settled cases do not constitute a reliable gauge of the appropriate amount of compensation to be awarded in other SPU SIRVA cases.

[9] The rest of these cases resulting in damages after concession were either reflective of a proffer by Respondent (1,632 cases) or stipulation (29 cases). Although all proposed amounts denote *some* form of agreement reached by the parties, those presented by stipulation derive more from compromise than instances in which Respondent formally acknowledges that the settlement sum itself is a fair measure of damages.

[10] Of course, even though *any* such informally-resolved case must still be approved by a special master, these determinations do not provide the same judicial guidance or insight obtained from a reasoned decision. But given the aggregate number of such cases, these determinations nevertheless "provide *some* evidence of the kinds of awards received overall in comparable cases." *Sakovits v. Sec'y of Health & Human Servs.*, No. 17-1028V, 2020 WL 3729420, at *4 (Fed. Cl. Spec. Mstr. June 4, 2020) (discussing the difference between cases in which damages are agreed upon by the parties and cases in which damages are determined by a special master).

| | Damages Decisions by Special Master | Proffered Damages | Stipulated Damages | Stipulated[11] Agreement |
|---|---|---|---|---|
| **Total Cases** | *173* | *1,632* | *29* | *1,377* |
| **Lowest** | $40,757.91 | $22,500.00 | $45,000.00 | $5,000.00 |
| **1st Quartile** | $70,203.12 | $62,825.18 | $90,000.00 | $38,134.81 |
| **Median** | **$92,299.83** | **$83,039.25** | **$130,000.00** | **$55,000.00** |
| **3rd Quartile** | $125,000.00 | $111,475.61 | $162,500.00 | $80,803.17 |
| **Largest** | $265,034.87 | $1,845,047.00 | $1,500,000.00 | $550,000.00 |

## B.    Pain and Suffering Awards in Reasoned Decisions

In the 173 SPU SIRVA cases in which damages were the result of a reasoned decision, compensation for a petitioner's actual or past pain and suffering varied from $40,000.00 to $215,000.00, with $90,000.00 as the median amount. Only seven of these cases involved an award for future pain and suffering, with yearly awards ranging from $250.00 to $1,500.00.[12]

In cases with lower awards for past pain and suffering, many petitioners commonly demonstrated only mild to moderate levels of pain throughout their injury course. This lack of significant pain is often evidenced by a delay in seeking treatment – over six months in one case. In cases with more significant initial pain, petitioners usually experienced this greater pain for three months or less. Most petitioners displayed only mild to moderate limitations in range of motion ("ROM"), and MRI imaging showed evidence of mild to moderate pathologies such as tendinosis, bursitis, or edema. Many petitioners suffered from unrelated conditions to which a portion of their pain and suffering could be attributed. These SIRVAs usually resolved after one to two cortisone injections and two months or less of physical therapy ("PT"). None required surgery. Except in one case involving very mild pain levels, the duration of the SIRVA injury ranged from six to 30 months, with most petitioners averaging approximately nine months of pain. Although some petitioners asserted residual pain, the prognosis in these cases was positive.

Cases with higher awards for past pain and suffering involved petitioners who suffered more significant levels of pain, and SIRVAs of longer duration. Most of these

---

[11] Two awards were for an annuity only, the exact amounts which were not determined at the time of judgment.

[12] Additionally, a first-year future pain and suffering award of $10,000.00 was made in one case. *Dhanoa v. Sec'y of Health & Human Servs.*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018).

petitioners subjectively rated their pain within the upper half of a ten-point pain scale and sought treatment of their SIRVAs more immediately, often within 30 days of vaccination. All experienced moderate to severe limitations in range of motion. MRI imaging showed more significant findings, with the majority showing evidence of partial tearing. Surgery or significant conservative treatment, up to 133 PT sessions - occasionally spanning several years, and multiple cortisone injections, were required in these cases. In six cases, petitioners provided sufficient evidence of permanent injuries to warrant yearly compensation for future or projected pain and suffering.

## VII.   Appropriate Compensation for Petitioner's Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact her awareness of her injury. Therefore, I analyze principally the severity and duration of Petitioner's injury.

The record reflects that Petitioner suffered a moderate SIRVA that continued for over 31 months, with fluctuating pain levels and ROM restrictions. Her pain ranged from mild to severe, with the most intense pain lasting for the first three months of her injury (when she reported that she could hardly lift her arm). At worst she had relatively severe ROM restrictions. She attempted conservative care, including a steroid injection, medication, and rest, without relief. Ultimately, she underwent surgery twenty months after her injury. She subsequently improved, and by five months after surgery she had minimal symptoms and her ROM was nearly symmetrical in both shoulders, although her ROM again worsened later. She participated in seven PT sessions, showing moderate improvement after, but continued to display limited ROM and was unable to meet her treatment goals.

Respondent suggests that there are gaps in Petitioner's treatment that should reduce her award. But review of the record reveals that over the course of more than 31 months Petitioner consistently sought care without significant gaps. Throughout, she reported pain, though of varying intensities, and as well as reduced ROM and sleep disturbances. Thus, this is not a case where gaps in treatment counsel against a larger pain and suffering award.

Because Petitioner's personal statement is unsigned and unsworn, it is entitled to little weight. *See, e.g., Buck v. Sec'y of Health & Human Servs.*, No. 19-1301V, 2023 WL 6213423, at *7 n.6 (Fed. Cl. Spec. Mstr. Aug. 23, 2023) (declining to place substantial weight on an unsigned and unsworn letter). However, it provides some support to Petitioner's claim to the extent that it is corroborated by other records. *Id.*

Petitioner's injury was of a similar duration to *Blanco* and *Wilson*, though less severe. *Hunt* and *Shelton,* by contrast, involved injuries of a much shorter duration, and

the evident treatment gaps in *Shelton* were a factor in a lower award.[13] Petitioner's injury is similar to *Rafferty*, with somewhat less severe pain and ROM limitations but a much longer duration.[14] Petitioner and the *Rafferty* petitioner both first sought treatment approximately six weeks after vaccination, although Ms. McKay made two calls to her PCP prior to going to urgent care. Both underwent surgery and PT, with the *Rafferty* petitioner attending more PT. Petitioner had one steroid injection, while the *Rafferty* petitioner did not. And both were left with residual symptoms after treatment. I find that *Rafferty* is the best comparable, and the same award is warranted in this case.

## Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **I find that $127,500.00.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering**.[15] **I also find that Petitioner is entitled to $676.71 in actual unreimbursable expenses.**[16]

Based on consideration of the record as a whole and arguments of the parties, **I award Petitioner a lump sum payment of $128,176.71, in the form of a check payable to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a).

The Clerk of Court is directed to enter judgment in accordance with this Decision.[17]

---

[13] In *Hunt*, the petitioner had "largely returned to her baseline condition" by 15 months after vaccination. *Hunt*, 2022 WL 2826662, at *9. In *Shelton*, the petitioner's five month delay in seeking care, followed by another three month gap immediately thereafter, showing that she "could cope with injury for such a long period of time counsel[ing] in favor of a lower pain and suffering award." *Shelton*, 2021 WL 2550093, at *7.

[14] The *Rafferty* petitioner treated for eleven months, while Ms. McKay treated for over 31 months.

[15] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Human Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Human Servs.*, 32 F.3d 552 (Fed. Cir. 1994))..

[16] The parties agree to this sum. Pet. at 1; Resp. at 10.

[17] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.

**IT IS SO ORDERED.**

<u>**s/Brian H. Corcoran**</u>
Brian H. Corcoran
Chief Special Master